# In The United States Court of Federal Claims

No. 04-1390C

(Filed: September 6, 2006)

_____

| | | |
|---|---|---|
| NATIONAL AMERICAN INSURANCE COMPANY, | * * | Motion to dismiss; Cross-motions for summary judgment; Surety with payment |
| | * | bond; Doctrine of subrogation; *Dicta* in |
| Plaintiff, | * | *Insurance Co. of the West* conflicts with |
| | * | prior binding precedent and will not be |
| v. | * | followed; Tucker Act covers damages claim |
| | * | arising where payment bond surety pays |
| THE UNITED STATES, | * | subcontractors; Defendant liable where, |
| | * | after receiving notice from surety, it |
| Defendant. | * | disburses funds to contractor. |

_____

**OPINION**

_____

**ALLEGRA, Judge**:

"*Dictum settles nothing, even in the court that utters it.*"[1]

This surety action is before the court on plaintiff's motion for summary judgment and defendant's motion to dismiss or, in the alternative, cross-motion for summary judgment.[2] The plaintiff, a payment bond surety, claims that it was damaged when, having paid the claims of subcontractors of a government contractor and having notified the United States to make no further payments to the contractor, the United States made a final contract payment directly to the government contractor. Defendant claims, *inter alia*, that plaintiff's complaints fails to state a claim. But, defendant is incorrect, as a barrage of new precedent illustrates. For the reasons that follow, the court thus **GRANTS** plaintiff's motion and **DENIES** defendant's motions.

---

[1] *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 352 n.12 (2005).

[2] *Amicus curiae* briefs in support of plaintiff were filed by the Surety Association of America.

I.  **Facts and Procedural History**

The material facts of this case are not in dispute.

On June 11, 1996, the United States Small Business Administration (SBA) entered into Contract No. V101(93)P-1564 with Innovative PBX Telephone Service, Inc. (IPBX) for a replacement telephone system for the Department of Veterans Affairs (VA) Medical Center in Palo Alto, CA. The contract was administered by the VA. On June 14, 1996, National American Insurance Company (NAICO), as surety, and IPBX, as principal, executed payment and performance bonds in favor of the United States. On July 1, 1996, IPBX executed an "Assignment of Claims Under Government Contract" in favor of NationsBank of Texas, N.A. (Nations). This assignment was acknowledged and agreed to by defendant, requiring the latter to deposit "all moneys due and to become due" into a restricted account at Nations. Thereafter NAICO (through its agent, Shaw & Associates (Shaw)), IPBX, and Nations entered into a "Depository Agreement for Restricted Accounts." In accordance with these agreements, defendant deposited progress payments into this restricted account.

IPBX entered into a subcontract with Nortel Communications Systems, Inc., in connection with the project. On December 23, 1997, after IPBX completed its work on the contract, Wiltel Communications, LLC, as successor to Nortel, notified NAICO that it was owed approximately $675,000 for labor and materials that IPBX had failed to pay. Wiltel asserted a Miller Act claim under the payment bond issued by NAICO. On December 30, 1997, Shaw (acting as NAICO's agent) notified defendant that no additional payments were to be made to IPBX due to the pending Miller Act claim, and that all remaining contract funds should be held for NAICO's benefit.[3] Additional conversations between NAICO's representatives and defendant's contracting officer, Ms. Marcelina Bell, occurred in 1998 and 2000, in which NAICO asserted a right to the remaining funds owed by the Government to IPBX, and reiterated that no payments were to be made to IPBX without NAICO's written consent.

---

[3]  Specifically, this letter stated –

Shaw and Associates, Inc. is the representative of National American Insurance Company on the above referenced project. We have been informed of an unpaid subcontractor on this job, and there may be others.

This letter is to advise you that the surety has an interest in the contract funds on this project. On behalf of the surety, we are requesting that you hold all of the remaining contract funds, including any monies under negotiation for increases to this contract, until this matter has been resolved and a consent of surety has been received.

On August 28, 1998, Williams Communications Solutions, LLC, as successor to Wiltel, filed suit against IPBX and NAICO in the United States District Court for the Northern District of California. On May 5, 2000, a representative of plaintiff wrote Ms. Bell to remind her that no payment should be made to IPBX without NAICO's written consent;[4] a further confirming letter was sent by plaintiff's representative to Ms. Bell on July 24, 2000. On August 3, 2000, NAICO settled the Miller Act payment bond claim, with the consent of IPBX, for $354,224. On August 10, 2000, IPBX wrote Ms. Bell a letter that included its assignment of the contract proceeds to NAICO and which directed defendant to pay all contract proceeds to NAICO. Additional conversations between NAICO, through its representative, and Ms. Bell occurred in September, October, and December of 2000. The parties agree that, in these conversations, NAICO restated its position concerning the contract funds and Ms. Bell did not voice any objection to the purported assignment; they disagree as to whether Ms. Bell promised to make any future contract payments to NAICO. Another follow-up letter detailing NAICO's position was sent to Ms. Bell on December 20, 2000.[5]

On or about June 11, 2001, NAICO learned that, in May of 2001, Ms. Bell had made a final payment in the amount of $504,591.55 directly to IPBX. NAICO was not contacted before this payment was made, and the payment was not made through the disbursal account at Nations. As Wiltel was the only subcontractor that asserted a payment bond claim, all claims and potential claims of creditors have been paid or settled and, after applying payments totaling $376,675 received from IPBX, NAICO is claiming a loss in the amount of $277,854.66 against the defendant.

---

[4] This letter stated, in relevant part –

As you know, Williams Communications Solutions, L.L.C. ("Williams") has filed suit against NAICO and [IPBX] to recover a substantial sum it claims is owed by [IPBX] on a United States Department of Veterans Affairs contract bonded by NAICO. It is my understanding that the Department is currently holding contract funds owed to [IPBX]. Quite some time ago, when this dispute first arose, you were advised to not make any further payments to [IPBX]. The purpose of this letter is to reaffirm that no further payments should be made to [IPBX] absent the written consent of NAICO. Upon resolving Williams' lawsuit, it is NAICO's intention to pursue any claims which [IPBX] (or Williams) may have against the Department.

[5] This letter indicated –

As I have indicated in past telephone conversations and letters, [NAICO], as assignee and subrogee of [IPBX], should receive any future payments on the referenced project. This will serve as a friendly reminder that [NAICO] should be the payee/recipient of all future payments.

On August 27, 2004, plaintiff filed its complaint in this action. On November 29, 2004, defendant filed its answer. This case was then reassigned to the undersigned. Following a period of discovery, the parties filed cross-motions for summary judgment, and oral argument was held on February 23, 2006.

## II.  Discussion

### A.  Defendant's motion to dismiss.[6]

A threshold issue in this case is whether this court may consider plaintiff's damages claim, which originates from its performance upon a Miller Act payment bond.[7] Under the Tucker Act, this court has jurisdiction to "render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States . . . ." 28 U.S.C. § 1491(a)(1) (2004). The Tucker Act, however, merely confers jurisdiction on this court and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976); *see also Wells v. United States*, 46 Fed. Cl. 178, 180 (2000). Waivers of sovereign immunity cannot be implied, but must be expressed "unequivocally" by Congress, *Testan*, 424 U.S. at 399, and the Supreme Court has repeatedly admonished that waivers "must be 'construed strictly in favor of the sovereign.'" *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992) (quoting *McMahon v. United States*, 342 U.S. 25, 27 (1951)).

---

[6] Dismissal under RCFC 12(b)(6), for failure to state a claim, is appropriate "when the facts asserted by the plaintiff do not entitle him to a legal remedy." *Boyle v. United States*, 200 F.3d 1369, 1372 (Fed. Cir. 2000). In reviewing such a motion, the court must accept, as true, the facts alleged in the complaint, *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633 (1999), and must construe all reasonable inferences in favor of the non-movant. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001). When this court takes jurisdiction over a claim under the Tucker Act, a ruling on the merits that plaintiff's case does not fit within the scope of the Tucker Act is a dismissal for failure to state a claim under RCFC 12(b)(6), not a dismissal for lack of jurisdiction under RCFC 12(b)(1). *Fisher v. United States*, 402 F.3d 1167, 1175-76 (Fed. Cir. 2005) (en banc); *see also United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003).

[7] The Heard Act, 28 Stat. 278 (1894), as amended, 33 Stat. 811 (1905), required a contractor, as a condition for receiving an award, to obtain a single bond securing to the United States faithful performance of the contract and prompt payment of materialmen and laborers. *See Equitable Sur. Co. v. United States*, 234 U.S. 449 (1914). This statute was superseded in 1935 by the passage of the Miller Act, 49 Stat. 794 (1935). The latter act retained the requirement that a contractor obtain both performance and payment protections, but allowed that to be accomplished via two instruments, providing greater flexibility. *See* Peter G. Kelly, Comment, "Reconsideration of Subrogative Rights of the Miller Act Payment Bond Surety", 71 Yale L.J. 1274, 1276-77 (1962) (hereinafter "Miller Act Payment Bond").

In what has become a well-rehearsed refrain, defendant asseverates that a surety who, under a payment bond, discharges a government contractor's obligation to pay subcontractors is subrogated only to the rights of the subcontractors.  Such a surety, defendant contends, does not step into the shoes of the government contractor so as to have an enforceable claim against the United States cognizable under the Tucker Act.  According to defendant, the latter occurs only when the surety performs under a performance bond.  For this proposition, it relies heavily upon *Insurance Co. of the West v. United States,* 243 F.3d 1367 (Fed. Cir. 2001) (*ICW*), in which the Federal Circuit remarked –

> It is well-established that a surety who discharges a contractor's obligation to pay subcontractors is subrogated only to the rights of the subcontractor.  Such a surety does not step into the shoes of the contractor and has no enforceable rights against the government.

*ICW*, 243 F.3d at 1371.  This passage, though, is plainly *obiter dicta,* as *ICW* involved only a performance bond.  *See Ins. Co. of the West v. United States*, 55 Fed. Cl. 529, 535 (2003) (making this observation on remand).  While, as stated *in lim'ine*, "dictum settles nothing," *Jama*, 125 S.Ct. at 706 n.12, *see also U.S. Bancorp Mortgage Co. v. Bonner Mall P'ship*, 513 U.S. 18, 24 (1994); *Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1307 (Fed. Cir. 2004), defendant, nonetheless, would have this court treat the above statement as if it were authoritative.  The court could reach that conclusion only if it turns a blind eye to more than a century of precedent – precedent that reveals that it is not the *dicta* in *ICW,* but only its converse, that is "well-established."  Those cases well-establish, in other words, that a surety who discharges a contractor's obligation is subrogated to the rights of the contractor and, where appropriate, may enforce those rights against the United States.

A quintet of recent cases in this court have so held, all concluding that the *ICW dicta* quoted by defendant cannot be squared with the law:  *Travelers Indem. Co. v. United States*, 2006 WL 2079106 (Fed. Cl. Jul. 26, 2006); *Cincinnati Ins. Co. v. United States*, 71 Fed. Cl. 544 (2006); *Commercial Cas. Ins. Co. of Ga. v. United States*, 71 Fed. Cl. 104 (2006); *Liberty Mut. Ins. Co. v. United States*, 70 Fed. Cl. 37 (2006); *Nova Cas. Co. v. United States*, 69 Fed. Cl. 284 (2006).  Each of these decisions cites a progression of precedent in support of the conclusion that the payor on a payment bond is subrogated to the rights of the prime contractor in any retained contract funds and that, by virtue of that subrogation, the surety has a claim against the United States and may, therefore, invoke the jurisdiction of the Tucker Act.[8]  In the first instance, these

---

[8] *See, e.g., Travelers Indem.*, 2006 WL 2079106 at *7, *9 ("In sum, decisions by the Supreme Court and this circuit are generally uniform in holding that (1) a surety that satisfies its payment, but not its performance, bond and settles all unpaid claims of laborers and materialmen is subrogated to the equitable rights both of the subcontractors and of the prime contractor in any retained contract funds . . . .  This court therefore concludes that the Tucker Act's waiver of sovereign immunity encompasses the claim of a surety . . . to recover from the United States an

cases rely on a continuum of Supreme Court decisions that begins with *Prairie State Nat'l Bank of Chicago v. United States*, 164 U.S. 227 (1896), in which, more than a century ago, the Supreme Court already had characterized the notion that surety could become subrogated to a government contractor as being "elementary," *id.* at 231.  As these cases note,[9] this line of Supreme Court precedent culminates in *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 141 (1962), in which the Court held that "a Miller Act payment bond surety is subrogated to the rights of . . . the prime contractor that is in privity of contract with the government." *Liberty Mut. Ins.* Co., 70 Fed. Cl. at 50 (citing *Pearlman*, 371 U.S. at 141); *see also United States v. Munsey Trust Co. of Washington, D.C.*, 332 U.S. 234, 240 (1947); *Henningsen v. U.S. Fid. & Guar. Co.*, 208 U.S. 404, 410 (1908).

      Confirming the continuing viability of these Supreme Court decisions, the aforementioned opinions examined decisions of more recent vintage, particularly, *Balboa v. Ins. Co. v. United States*, 775 F.2d 1158 (Fed. Cir. 1985), a case that *ICW* characterized as "correctly stat[ing] the law of equitable subrogation." 243 F.3d at 1375 n.3.[10]  *Balboa* is particularly relevant here as it involves facts analogous to those *sub judice*.  There, the Federal Circuit held that a payment bond surety could sue the United States for damages occasioned when the government made progress payments to a contractor, despite having been notified by the surety

---

amount equal to the damages it suffered with respect to the payment bond."); *Commercial Cas. Ins. Co.*, 71 Fed. Cl. at 110-11 ("[T]he court agrees with the holdings in *Nova* and *Liberty Mutual* that a payment bond surety is equitably subrogated to the rights of both the subcontractors whom it pays and the prime contractor whose debt it pays when it fulfills its payment bond obligations. . . . Because the court has resolved that the payment bond surety has stepped into the prime contractor's shoes and is subrogated to the rights of the prime contractor, the payment bond surety may rely on the prime contractor's privity and sue the government."); *Liberty Mut. Ins. Co.*, 70 Fed. Cl. at 42-43 ("[T]he doctrine of *stare decisis* binds the court to the rule of equitable subrogation already established by Supreme Court cases . . . notwithstanding the *dicta* from [*ICW*] . . . .  So subrogated, [plaintiff] may avail itself of a waiver of sovereign immunity in the Tucker Act and enforce [the contractor's] contractual rights against the government."); *Nova Cas. Co.*, 69 Fed. Cl. at 295-96 ("The language [in *ICW*] is correct insofar as it describes the relationship between a surety on a payment bond and subcontractors, but it is incomplete.  It does not describe such a surety's connection also with the contractor. . . . In short, the Tucker Act supplies a waiver of sovereign immunity for a surety making a claim of equitable subrogation after having satisfied its obligations under a payment bond, just as the Tucker Act also serves that purpose for a surety who has satisfied a performance bond.  For purposes of sovereign immunity there is no difference between the posture of the two sureties.").

    [9] *See Travelers Indem.*, 2006 WL 2079106 at *4-7; *Commercial Cas. Ins. Co.*, 71 Fed. Cl. at 108-10; *Liberty Mut. Ins. Co.*, 70 Fed. Cl. at 43-48; *Nova Cas. Co.*, 69 Fed. Cl. at 292-94.

    [10] *See, e.g., Travelers Indem.*, 2006 WL 2079106 at *7-8; *Commercial Cas. Ins. Co.*, 71 Fed. Cl. at 109-10; *Liberty Mut. Ins. Co.*, 70 Fed. Cl. at 42, 48.

that it had made payments to subcontractors and materialmen and that payments should not be made without the surety's consent.  Noting that "several cases" had "recognized jurisdiction over a surety's cause," *Balboa*, 775 F.2d at 1163,[11] the Federal Circuit quoted liberally from one of those decisions, observing –

> "[T]he surety was entitled to the benefit of ***all*** the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid.  The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the [United States]."

*Balboa*, 775 F.2d at 1161 (quoting *U.S. Fid. & Guar. Co. v. United States*, 475 F.2d 1377, 1382 (Ct. Cl. 1973) (emphasis in original)).  Finding that the Tucker Act supported such a suit, the Federal Circuit concluded, "we hold that both the Court of Federal Claims and this court have jurisdiction to hear the claim of a Miller Act surety against the United States for funds allegedly improperly disbursed to a contractor."  *Id*. at 1163; *see also Transamerica Ins. Co. v. United States*, 989 F.2d 1188 (Fed. Cir. 1993).  A variety of cases reaffirm that the rationale of *Balboa* applies to payments made with respect to a payment bond and have rejected claims, repeated by defendant here, that equitable subrogation to the claims of the contractor does not occur unless the surety assumes the responsibility for completing the contract under a performance bond.[12]

Defendant attempts to sidestep these dozen or so precedents on the supposed strength of two Supreme Court decisions.  First, it relies upon *Munsey Trust Co., supra*, in which a payment bond surety sought to obtain funds retained by the government unreduced by a government setoff by arguing that it was subrogated to the superior rights of the subcontractors.  To be sure, the Court rejected this argument – but not based on some wholesale revision of the law of equitable subrogation, but rather because it concluded that the subrogated surety was subject to the priority claims that the United States held against the contractor.  332 U.S. at 242 ("it is elementary that

---

[11] Among the many decisions cited by the court were *Am. Fid. Fire Ins. Co. v. United States*, 513 F.2d 1375 (Ct. Cl. 1975); *United Pac. Ins. Co. v. United States*, 319 F.2d 893 (Ct. Cl. 1963); *Newark Ins. Co. v. United States*, 169 F. Supp. 955 (Ct. Cl. 1959); *Home Indem. Co. v. United States*, 376 F.2d 890, 892 (Ct. Cl. 1967); *see also* Robert J. Duke, "The Tucker Act and Payment Bond Surety's Equitable Claim of Subrogation Post-*Blue Fox*: Keys to the Courthouse Doors," 54 Cath. U. L. Rev. 267, 271-72 (2004).

[12] *See, e.g., Commercial Cas. Ins.*, 71 Fed. Cl. at 110 ("the Federal Circuit has repeatedly reaffirmed the view that a surety may sue the United States, without distinguishing between performance and payment bonds"); *Liberty Mut. Ins.*, 70 Fed. Cl. at 43; *Nova Cas. Co.*, 69 Fed. Cl. at 293-94; *Preferred Nat. Ins. Co. v. United States*, 54 Fed. Cl. 600, 604 (2002); *Transamerica Premier Ins. Co. v. United States*, 32 Fed. Cl. 308, 312 (1994); *Int'l Fidelity Ins. Co. v. United States*, 25 Cl. Ct. 469, 473-74 (1992); *see also Security Ins. Co. v. United States*, 428 F.2d 838, 842 (Ct. Cl. 1970); *Continental Cas. Co. v. United States*, 169 F. Supp. 945, 947 (Ct. Cl. 1959).

one cannot acquire by subrogation what another whose rights he claims did not have"). This reading of *Munsey Trust* has been repeatedly confirmed, particularly by the Supreme Court and the Court of Claims in *Pearlman*, 371 U.S. at 140-41 and *U.S. Fid. & Guar.*, 475 F.2d at 1382, respectively.[13]

Defendant next invokes *Department of the Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999), for the proposition that, under the Tucker Act, a surety may only sue the government if it has actually entered into a contract therewith, so as to confer privity. Wholly apart from the fact that *Blue Fox* involved neither the Tucker Act nor a surety, any notion that decision *sub silentio* undercut a constellation of cases holding that subrogation claims may be brought under the Tucker Act was flatly rejected by none other than *ICW*. There, the Federal Circuit held that "a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act and bring suit against the United States," *ICW*, 243 F.3d at 1375, reasoning that the Tucker Act "waiv[es] sovereign immunity as to claims, not particular claimants," *id*. at 1373-74.[14] *ICW* and other cases emphasize that while cases like *Prairie State*

---

[13] Indeed, in *Pearlman*, the Supreme Court stated –

> The final argument is that the *Prairie Bank* and *Henningsen* cases were in effect overruled by our holding and opinion in *United States v. Munsey Trust Co.*, *supra*. The point at issue in that case was whether the United States while holding a fund like the one in this case could offset against the contractor a claim bearing no relationship to the contractor's claim there at issue. We held that the Government could exercise the well-established common-law right of debtors to offset claims of their own against their creditors. This was all we held. The opinion contained statements which some have interpreted as meaning that we were abandoning the established legal and equitable principles of the *Prairie Bank* and *Henningsen* cases under which sureties can indemnify themselves against losses. But the equitable rights of a surety declared in the *Prairie Bank* case as to sureties who complete the performance of a contract were expressly recognized and approved in *Munsey*, and the *Henningsen* rule as to sureties who had not completed the contract but had paid laborers was not mentioned. *Henningsen* was not even cited in the *Munsey* opinion. We hold that *Munsey* left the rule in *Prairie Bank* and *Henningsen* undisturbed. We cannot say that such a firmly established rule was so casually overruled.

371 U.S. at 140-141 (footnotes omitted). Further discussion concerning *Munsey Trust* and why it does not support defendant's claims may be found in several recent cases. *See, e.g., Travelers Indem.*, 2006 WL 2079106 at *8 n.12; *Liberty Mut. Ins. Co.*, 70 Fed. Cl. at 52 n.16; *Nova Cas. Co.*, 69 Fed. Cl. at 292-93.

[14] Indeed, in terms of its holding, *ICW* represents perhaps the strongest case against defendant's view that claims based upon the equitable doctrine of subrogation are not cognizable under the Tucker Act. *See Commercial Cas. Ins. Co.*, 71 Fed. Cl. at 110 n.8 ("*ICW* resolved the

-8-

do not directly confirm waivers of sovereign immunity, they do establish that subrogation may give rise to monetary claims against the United States, thereby providing the necessary predicate for properly invoking the Tucker Act. *See ICW*, 243 F.3d at 1370-71; *see also Commercial Cas. Ins. Co.*, 71 Fed. Cl. at 110; *Liberty Mut. Ins. Co.*, 70 Fed. Cl. at 41-42; *Nova. Cas. Co.*, 69 Fed. Cl. at 292-94. Hence, *Munsey Trust* and *Blue Fox* avail defendant naught.[15]

Accordingly, as has been repeatedly held, the court finds that when a surety has made payments on a payment bond and satisfied all outstanding claims, it is equitably subrogated to the rights of the primary contractor. In such circumstances, it is beyond peradventure that the Tucker Act grants a waiver of sovereign immunity for this court to entertain the merits of the surety's damage claim. Therefore, defendant's motion for failure to state a claim must fail.

### B.    The cross-motions for summary judgment.[16]

Having found jurisdiction, the court must next decide whether NAIC is entitled to recover $277,854.66 in damages from the United States. Plaintiff claims that there is no dispute that notice was given to defendant, before the final payment was improperly made, that no further payments were to be made to the contractor, and that the government, therefore, breached its duty as a stakeholder. Defendant contends that the surety as subrogee has no greater claim than that which the contractor has, and because the contractor was paid by the United States, the surety has nothing to enforce against defendant.

---

problem created by *Blue Fox* by holding that the subrogee of a government contractor may sue the United States."); *Liberty Mut. Ins. Co.*, 70 Fed. Cl. at 51.

[15] Defendant contends that, unlike in the case of a performance bond, it does not benefit from a surety's performance of a payment bond. This claim is both wrong and irrelevant. As to the former, it is clear that the availability of subrogation potentially reduces the contractor's cost of performance, which reduction ultimately redounds to the government's favor. Thus, as one commentator has stated –

> Since subrogation is a prime element in the salvage procedure exclusively relied upon by the surety for mitigation of loss, denying him such rights must increase the loss and therefore the rate charged for the bond, which adds to the Government's costs for the prime contract.

*See* "Miller Act Payment Bond," 71 Yale L.J. at 1279. Defendant's contention is also irrelevant because, upon payment to the subcontractors, the surety becomes subrogated to the rights of the contractor, whether or not such subrogation immediately serves defendant's interests in a particular case.

[16] Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"It is axiomatic that 'before any obligation arises to withhold or divert funds, the Government must be notified that the sureties believe the contractor is in default and cannot complete the contract.'" *Am. Ins. Co. v. United States*, 62 Fed. Cl. 151, 155 (2004) (quoting *Ransom v. United States*, 17 Cl. Ct. 263, 272 (1989), *aff'd*, 900 F.2d 242 (Fed. Cir. 1990)). More specifically, for the stakeholder duty to arise, the government must have "due notice of the facts giving rise to an equitable right in the plaintiff surety company, and of the plaintiff's assertion of such a right." *Newark Ins. Co. v. United States*, 169 F. Supp. 955, 957 (Ct. Cl. 1959). Once this notice is given, however, defendant should know that "the contractor no longer ha[s] any property rights in the contract fund." *Home Indem. Co. v. United States*, 376 F.2d 890, 893 (1967). "[T]he government [becomes] a stakeholder with respect to the amount not yet expended under the contract that it holds at the time of notification of default." *Balboa*, 775 F.2d at 1162 (citing *Great Am. Ins. Co.*, 492 F.2d at 825); *see also Argonaut Ins. Co. v. United States*, 434 F.2d 1362, 1367 (Ct. Cl. 1970); *Cincinnati Ins. Co.*, 71 Fed. Cl. at 547-48; *American Ins. Co. v. United States*, 62 Fed. Cl. 151, 156 (2004).

The parties agree on the material facts concerning the notices that defendant received. On December 20, 1997, defendant was notified that no additional payments were to be made to IPBX and that all remaining funds should be held for plaintiff's benefit. A variety of other communications, including letters on May 5 and July 24, 2000, confirmed that plaintiff was asserting a right to the remaining funds. Clearly, defendant was on notice that the surety was asserting a right to the contract funds prior to the final payment it made to IPBX in May of 2001. Defendant contends that the notices it received from plaintiff's representatives merely vested it with discretion to decide the proper disposition of the final contract proceeds. But, while defendant may have discretion in disbursing progress payments before performance is completed, that discretion evaporates once the contract is completed and defendant is notified as to the possibility of an unpaid subcontractor's claim and the surety's demand that contract funds be protected. *See Travelers Indem. Co.*, 2006 WL 2079106 at *10; *cf. U.S. Fid. & Guar. Co. v United States*, 676 F.2d 622, 628 (Ct. Cl. 1980) (government may exercise discretion as to the disposition of a progress payment); *American Ins. Co.*, 62 Fed. Cl. at 157. In the latter circumstances, defendant is charged with a duty not to make a final payment to the contractor. *See Home Indem. Co.*, 376 F.2d at 893; *Newark Ins. Co.*, 169 F. Supp. at 957; *Int'l Fid. Ins. Co.* 25 Cl. Ct. at 477-78; *see also* "Miller Act Payment Bond," 71 Yale L.J. at 1290. Here, it appears defendant violated that duty, causing damage to plaintiff.[17]

---

[17] For the first time in its reply brief, defendant seems to suggest that the notices provided by plaintiff were inadequate to trigger any duty because they did not explicitly indicate that the contractor had defaulted on its payment obligations. In the court's view, this claim, which clearly could have been raised in defendant's cross-motion/response, is not properly before the court. *See Pac. Gas and Elec. Co. v. United States*, 69 Fed. Cl. 784, 817 (2006) (citing cases). Even if it were, it would be wrong. The record irrefutably indicates that before defendant released funds to the contractor, it was aware, as the result of a series of communications, that the contractor had not paid at least one of its subcontractors; that, as a result, the surety had been sued; that the surety had settled that lawsuit; and that, as a result, the contractor had assigned its

But what of defendant's banner defense – that it discharged its obligations when it paid the final contract proceeds to the original contractor? As it turns out, this assertion misses the mark for several reasons. For one thing, in a case such as this, the government assumes the role of a stakeholder and cannot, without potentially being obliged to pay twice, decide the merits of the competing clams by delivering the stake to one of two potential claimants.[18] That is particularly so, where, as here, there was little doubt as to who was entitled to the funds, especially given defendant's acquiescence in depositing progress payments under the contract into a restricted account partially designated by NAICO. Indeed, from a theoretical standpoint, once the surety steps into the shoes of the contractor, a payment to the latter no more discharges the government's obligation to the surety than would disbursing funds to a perfect stranger. That is because once the surety puts on the contractor's shoes, the latter, under the law, no longer occupies them.[19] For this and other reasons, defendant's theory not only has been rejected explicitly in several cases, *see, e.g.*, *Capitol Indem Corp. v. United States*, 71 Fed. Cl. 98, 101 (2006) ("Because the government is a mere stakeholder, its subsequent payment to the contractor cannot alone satisfy or release the contractor's claim."), but cannot be harmonized with the more than a dozen cases in which liability has been predicated upon defendant paying its contractor moneys that should have been turned over to a surety. *See, e.g.*, *Newark Ins.*, 169 F. Supp. at 957 ("If it is made to appear that the Government's officials, after due notice of the facts giving rise to an equitable right in the plaintiff surety company, and of the plaintiff's assertion of such a right, paid out, without a valid reason for so doing, the money in question to someone other than the plaintiff, the plaintiff will be entitled to a judgment."); *Travelers Indem. Co.*, 2006 WL 2079106 at * 9; *Capital Indem. Corp.*, 71 Fed. Cl. at 101; *Transamerica Premier Ins. Co. v. United States*, 32 Fed. Cl. 308, 316 (1994) (citing cases). If defendant is correct, all these cases were decided wrongly – but, the converse, of course, is true.

---

rights in the contract balance to plaintiff. Defendant cites no case that would suggest that it received inadequate notice and its attempt to graft various hypertechnical prongs onto the notice requirement is not supported by *Balboa*. *See Balboa*, 775 F.2d at 1162 (noting that the subrogation claim arises "upon notification by the surety of the unsatisfied claims of the materialmen").

[18] *See Am. Fid. Fire Ins. Co. v. United States*, 513 F.2d 1375, 1379 (Ct. Cl. 1975); *Home Indem. Co.*, 376 F.2d at 893-94 ("the Government had no right as a stakeholder to settle the question unilaterally by paying the fund to the contractor"); *Continental Cas. Co.*, 169 F. Supp. at 946-47; *Commercial Cas. Ins. Co.*, 71 Fed. Cl. at 112 n.10.

[19] *See, e.g., United Bonding Ins. Co. v. Catalytic Const. Co.*, 533 F.2d 469, 475 (9th Cir. 1976) ("Payment to the contractor would not discharge liability if the surety subsequently established a right to the funds."); *see also Home Indem. Co.*, 376 F.2d at 894; "Miller Act Payment Bond," 71 Yale L.J. at 1290 ("the mere fact of disbursement is not determination of the surety's rights"). As that Roman writer of maxims, Publilius Syrus, put it – "you cannot put the same shoe on every foot."

Accordingly, under the undisputed facts of this case, plaintiff's right to equitable subrogation plainly attached, making defendant liable when it violated its duty as a stakeholder by making a final payment to the contractor. The parties do not dispute that, if such liability exists, the amount of damages owed in this regard corresponds to plaintiff's loss as a result of the aforementioned payment, *to wit*, $277,854.55.[20]

### III.  Conclusion

The refrain of a 15th century English ditty, known as the "Riddle Song," goes –

> I have four brothers over the sea,
> *Perry merry dictum domine*,
> They each sent a present unto me,
> *Perry merry dictum domine*,
> *Partum quartum pare dissentum*
> *Perry merry dictum, domine*.

One supposing that these lyrics say something profound about the power (*domine*) of *dictum* would be disappointed, as the rhyming "Latin" employed is prattle. While it might be too harsh to say the same of defendant's *dictum*-driven attempt to reinvent the law of subrogation, the fact of the matter is that its theory lacks not only precedential support, but a doctrinal foundation (with the latter undoubtedly contributing to the former). With this theory now having been rejected by a sextet of decisions, a prolonged *fermata* perhaps is in order.

The court need go no further.[21] For the foregoing reasons, the court **GRANTS** plaintiff's motion and **DENIES** defendant's motions. The clerk is directed to enter judgment for the plaintiff in the amount of $277,854.66.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[20]  It is not perfectly clear from the record how this loss figure was derived. However, plaintiff asserted this figure in one of its proposed findings of uncontroverted facts, supported by an affidavit. Defendant responded by disagreeing only with the legal conclusion that NAICO's loss was incurred "as a result of the Government's failure to protect NAICO's interests," indicating further that the "disagreement with the legal conclusion does not create an issue of triable fact." In its briefs, plaintiff reasserted this damage amount, at one point indicating that the loss was "undisputed." Defendant did not contest these statements in its briefs. Accordingly, the court sees no basis to disagree with plaintiff's assertion as to the amount at issue.

[21]  In particular, given the result reached, this court need not consider plaintiff's assignment and third-party beneficiary arguments.